FILED
2014 Sep-17  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

MICHAEL LORD,                    )
                                 )
            Plaintiff,           )
vs.                              )        Case No. 4:13-cv-593-TMP
                                 )
ALLSTATE INSURANCE               )
COMPANY,                         )
                                 )
            Defendant.           )

<u>MEMORANDUM OPINION</u>

On January 14, 2014, the defendant, Allstate Insurance Company ("Allstate"), filed its motion for partial summary judgment, seeking dismissal only of plaintiff Michael Lord's[1] claim for bad faith.  (Doc. 16)  The motion was fully briefed and orally argued before the court on August 6, 2014, which was followed by additional briefing at the request of the court.[2]  For the reasons explained below the motion is DENIED.

I. <u>Procedural History</u>

Plaintiffs filed their original complaint in this action in the Circuit Court of Etowah County, Alabama, on January 9, 2013, alleging that a rental cabin owned by Lord and his wife, and insured by Allstate, was damaged by a tornado on April 27, 2011, and that Allstate has refused to pay all of the covered damage to the house in breach of the insurance contract.

_____

[1] Although the original action was filed on behalf of Michael Lord and his wife, Sandra Lord, Sandra subsequently dismissed her claim without prejudice, on August 13, 2013.  (Doc. 8). Consequently, the court refers only to the claim of Michael Lord.

[2] The parties consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge on May 1, 2013 (doc. 7).

Further, in Count II of the complaint, plaintiff alleged a claim for "normal and abnormal" bad faith, asserting that Allstate has refused to pay his claim for damage without lawful justification and has "intentionally failed to determine whether or not there was any lawful basis for its refusal to pay" the claim.  (Doc. 1-1).  Defendant Allstate removed the action to this court on March 29, 2013 on the basis of diversity jurisdiction, which plaintiff has not challenged.  Upon completion of discovery, Allstate filed its motion for partial summary judgment.

## II.  Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine

issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If

the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir.  2009).   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  Summary Judgment Facts

Applying these standards to the proper evidence before the court, the following facts are undisputed or taken in a light most favorable to the non-moving plaintiff.

On April 27, 2011, a series of devastating tornadoes ripped across north and central Alabama, killing dozens of people and doing hundreds of millions of dollars in property damage. Due to the high volume of insurance claims made in the wake of the storm, Allstate regarded the event as a "catastrophe." (Plaintiff's Opposition, Ex. 5, Carroll Depo, doc. 21-5, at 29). On that date, plaintiff owned a cabin in Scottsboro, Alabama, built by him in 2003 to 2005, initially used as a home for himself and his wife, but later as rental property after 2009. (Lord Aff., doc. 21-1). Plaintiff built the cabin himself, without a contractor or engineer and without a set of plans. Plaintiff obtained casualty insurance on the cabin from Allstate on March 31, 2010, through agent Timothy Watwood in Boaz, Alabama. As part of the insurance underwriting, Allstate sent an inspector named Michael to inspect the cabin.[3] After the inspection, plaintiff and agent Watwood agreed that the replacement value of the cabin was $120,000.00. (*Id.*).

Plaintiff and his wife lived in the cabin until 2010, but rented it thereafter for $450.00 per month. At time of the 2011 tornado, the cabin was vacant and listed for sale with a realtor for $59,000.00. Just prior to the tornado, a buyer contracted to buy the cabin for the asking price of $59,000.00. A home inspection was performed as part of the buyer's effort to obtain financing, and no problems with the cabin were noted. The sale ultimately fell through when the buyer was unable to obtain financing, and it remained for sale when the tornado occurred.

As a result of high wind on April 27, 2011, a large tree fell in the driveway, near the cabin. The tree fell on the electrical service line to the cabin, pulling a weather mast away (but not loose) from the structure and doing roof damage in the area of the weather mast. When plaintiff went into the cabin after the storm, he noticed additional structure damage that had not

---

[3] The plaintiff's motion to strike the affidavit of Brian Henry (doc. 22) is DENIED. The affidavit does nothing but create a fact issue as to whether an inspection of the cabin occurred at the time it was first insured by Allstate.

been present before the storm, such as cracks in walls and door facings, cracks in the ceiling and floor, and wet and mildewed carpets.

Plaintiff contacted Allstate to make a claim for damage. Allstate made its first contact with him on May 2, 2011. A claim log note written by Gregory Schimmel summarized the nature of the claim as follows:

> Tree took down power lines to rental home (not rented) taking down the mast head and pulling away from building. Subsequent inside inspection shows shifting based on new cracks in drywall and ceramic floors. He's also found wetness on carpets and pantry.

(Plaintiff's Opposition, Ex. 2, doc. 21-2, p. 3). Four days later, on May 6, 2011, David Barnes was assigned as the adjuster on the claim. David Barnes was an employee of Pilot Catastrophe Services, an independent company brought in to help with adjusting. Barnes works principally as a barber, but he also did independent insurance adjusting as a "back up job." (Plaintiff's Opposition Ex. 4, Barnes Depo., doc. 21-4 at 5-6). Although Barnes had thirty years' experience in construction, he took a course in insurance adjusting in 2010, and this was his first association with both Pilot and Allstate as an adjuster. (*Id.* at 8). This was his first opportunity to adjust an insurance claim. (*Id.* at 9-10, 58).

Barnes went to the cabin alone on May 8, 2011, walking around the outside. (Plaintiff's Opposition, Ex. 3, Barnes Depo., doc. 21-4, at 48). On May 12, plaintiff's wife, Sandra, called to inquire about the status of their claim and was informed that David Barnes and Gregory Schimmel could be contacted about it. (Plaintiff's Opposition, Ex. 2, doc. 21-2, p. 5). On May 16, an entry was made in the Allstate claim log indicating that Barnes had contacted the Lords and was planning an inspection of their property for May 19, together with his supervisor, Curtis Henderson of "Tech Support." (*Id.* at 6).

Barnes and Henderson inspected the plaintiff's cabin on May 19, 2011.  A note written

by Karen Wyont in Allstate's claim log for that date states:

> **REASON FOR CALL**:   Insured's [sic] came to the agent's office after inspection with adjuster and field support stating they were unsure where they were on the claim process.
>
> **ACTION TAKEN**:  Reviewed the claim and contacted the field support.  Field Support indicated they were going to request an engineering report based on the damage in relation to the storm conditions in the area.  Relayed that information to the agent.  Insureds inquired through the agent what the schedule for that might be.  Explained to the agent there was a process to requesting an engineering report, and, if approved, the appointment would be according to the independent engineering firm's schedule.
>
> Ensured [sic] the agent I would monitor the claim and notify him when there was a decision made on the claim.
>
> There were no other concerns or issues at this time.

(*Id.* at 6).  Four hours after this note, Curtis Henderson wrote the following note in the claim log:

> Field Support Inspection - Curtis Hcnderson P# 827- 1:20 pm- Re inspected loss with adjuster David Barrnes and insureds Mr.& Mrs Michael Lord present. The home was vacant at the time of this inspection.
>
> The purpose of the inspection at this time was to evaluate the damages insureds were claiming that occurred as a result of tornado.  The inspection revealed that there was [sic] floors buckling in the dwelling, there are some cracks in some of the beams and cracks in some of the drywall in some of the rooms.  This damage is consistent with settlement damage.  There was no storm related damage exterior of the home except some debris dents to metal roofing, also the neighboring homes had no visible damages.  There was a tree blown down in insureds [sic] driveway as well as trees blown down several hundred yards behind his home in a pasture.
>
> I asked insured the age of home and the contractor who built the home.  He stated it was built in 2005 and that he had built the home with help from other workers. The home has very poor design and poor workmanship.
>
> The insured admitted that he had added additional foundation piers to the foundation at rear of the home after the tornado. He also stated that he had two

different contractors inspect the home but they have not completed repair estimates. He said that one contractor stated that repairs would be very expensive and that the other contractor stated that home was unrepairable. Insured also stated that home had been inspected several times over the past several years when it was insured with Allstate and when it was listed with Real Estate Agents. Will have adjuster attempt to obtain information regarding contractors [sic] names and phone numbers that have inspected home.

I explained to Insureds that we wou1d request an [sic] structural engineer to inspect the home and determine the cause of damages and repairs necessary but explained that if the damage was the result of settlement there would be no coverage. They became very upset and stated that the damages should be covered. The Insureds also wanted to know how long it would take to obtain engineer report. I explained that it would depend on engineers [sic] schedule but that it should be approx. 3-4 weeks. I explained that engineer would call them and set up inspection appointment. Insureds stated they understood but seemed very upset with the process.

Adjuster agreed to call admin and request engineer report asap. I explained that he could complete estimate on the roof damage, water damage to the ceiling, tree removal from driveway and any apparent storm damages.

(*Id.* at 7). In a separate claim-log note, adjuster Barnes also noted that he and Henderson had met with plaintiff, inspected the damage to the cabin, and told the plaintiff that they would have a structural engineer come for an inspection. (*Id.*). The next day, May 20, plaintiff Lord called Allstate to voice his concern about the inspection the day before. In that call, he told Allstate representative Spencer Apple that his cabin had been inspected by Allstate when the company first insured it and that he was told by the inspector that the house was in "excellent condition." (*Id.*). Lord also spoke to Allstate representative Kaylen Murciciak, who told him that if the damage to plaintiff's cabin were "not from storm as determined by engineer then those damages can not be included." (*Id.* at 7-8).

On May 23, adjuster Barnes was still attempting to get approval for engaging an engineer to inspect the damage to the plaintiff's cabin, and he talked to Curtis Henderson to get assistance. As recorded in the claim log, Henderson spoke to Chad Carroll and asked him about reviewing

plaintiff's claim "to determine if ordering an outside engineer was justified."  Henderson wrote, "He asked me about the damage and I explained that the damage appeared to be the result of settlement and there was no impact or damage to the exterior.  He stated he would review file and give me a decision in a few days."  (*Id.* at 8).  The decision, as recorded by Henderson in the claim log, came two days later, on May 25:

> Received call from OCR Chad Carroll and he stated that he had driven by loss location.  he [sic] stated that he did not feel an engineer report would be necessary on this claim.  He stated that damages should be written as could be documented.  Agreed to have adjuster give him a call if there are any questions.

(*Id.*).

On May 26, 2011, noted at the time of 11:44 a.m., Barnes made an entry in the claim log indicating that he "[m]et with MICHAEL LORD at loss location…; inspected damage, completed scope and secured photos."  He wrote further, "My inspection of the property found the following damages: Mr. Lord had stated that his home had shifted do [sic] to very high winds and that he had structure damaging to floors and crated [cracked] wall and crated [cracked] foundation, had A TA go out to inspire [sic] the home with me and we suggested that a structure engineer go and do a follow up with Mr. Lord we replaced the roof."  (*Id.* at 10).   At that time Barnes delivered an estimate to Lord of $4,378.56 for repair of the obvious roof damage and removal of the blown-down tree.  (Plaintiff's Ex. 3, doc. 21-3).  After the $1,000.00 deductible, Allstate offered to pay $3,378.56 for plaintiff's storm damage.

A little more than an hour later, at 12:53 p.m., Barnes made the following entry in the claim log:

> Called Mr. Lord to explain loss he understood the claim.  Mr. lord [sic] called back and said that he was refusing payment and was getting a law[y]er.  I called Mr. lord [sic] back his wife answered and [Barnes] explained that we are paying on undisputed loss and I explained the supplement process.

(*Id.* at 11).   Just three minutes after the conversation with plaintiff's wife, Barnes closed the claim in the claim log.  See Claim Log entry for 5/26/2011 at 12:56 p.m.  (*Id.*).  Barnes regarded that as his final decision on the claim, and he had no further involvement with it.  (Plaintiff's Opposition, Ex. 3, Barnes Depo., at 38, 44).  Later than same afternoon, in an entry made by Victoria Catrett at 4:22 p.m., relating to a conference call involving her, "FAA B. Haines," and adjuster Barnes, it was recorded that "Allstate is standing by their findings and will not request an engineer."  (Plaintiff's Opposition, Ex. 2, doc. 21-2, at 12).  Curtis Henderson also made an entry in the claim log at 8:44 p.m., saying that he had received a call from adjuster Barnes in which Barnes stated that he had received several calls from "agent advocates" with questions about the handing of the Lord claim.  Barnes told Henderson that he told the "agent advocates" that "his estimate represented damages that could be related to the storm and that is what he had explained to them."  Henderson "repeated [to Barnes] that I was told that Allstate would not be ordering an engineer report."  (*Id.* at 13).

The next day, May 27, an entry in the claim log reported that plaintiff Lord called "requesting a supplement. States the adjuster's estimate is inaccurate."  (*Id.* at 13).  On May 28, Allstate representative Christopher McRae wrote an entry at 8:54 a.m. that the adjuster had "entered his Closing Statement.  Also, the estimates are attached, payment has posted and subro [subrogation] has been addressed.  The claim is ready to close."  (*Id.*).  This entry was followed immediately by another stating, "Coverage closed" (*Id.*), and a third entry stating "File closed." (*Id.* at 14).

Despite these entries indicating that plaintiff's claim had been closed, Allstate assigned a new adjuster to review plaintiff's claim for supplemental coverage of the damage he claimed to the cabin.  On May 31, the new adjuster, Jami Connor, wrote the following in the claim log:

> Spoke with Mr. Lord about supplemental portion of claim.  Mr. Lord stated that he had two different contractors that have came [sic] to look at the home, but has not received a written estimate.  Mr. Lord stated that he would like someone to come out and take a look at the property to address damages that were not addressed by first adjuster.  Mr. Lord stated that he would be faxing in photos and the estimates once they were received.

(*Id.* at 15).  That same day, May 31, 2011, plaintiff's wife forwarded to Connor emails from two realtors containing 14 photographs of the house taken prior to the storm.[4]   (Plaintiff's Opposition, Ex. 13, doc. 21-13).  Sandra Lord's email described the photographs as follows:

> Jamie, these are the before photos of the house, you can see the carpet which got wet and has mold, the tiles which were not cracked are cracked and in living [room] have mold, also shows the sheetrock and and [sic] exposed beams the ceiling sheetrock in the back bedroom has gotten wet, the floors have buckled upward, the beam joints are lifted and pulled apart.

(*Id.*).  In a second email to Connor, Sandra Lord wrote:

> Jamie, this is the front of the house showing the foundation construction in which [sic] after the storm 4-27-11 has now been cracked, loosen one outer 4x6 beam has been cracked from joint and is giving way, we do have pictures also of the underneath of the house floor joints foundations where they have been comprised [sic, compromised?] mr.barnes didn't not [sic] want to look nor took pictures of that.  Thank you Sandra Lord [telephone omitted] let me know if you didn't get the attachment.

(*Id.*).  Connor forwarded the photos to Emma "Jewel" Gates, but there is no other indication of Gates role in the adjustment of this claim or what became of the photographs.  In the claim log, Connor noted in response to this that she would be transferring responsibility for the file to "the mold unit."  (Plaintiff's Opposition, Ex. 2, doc. 21-2, at 16).  The claim was then transferred to

---

[4]  Copies of the photographs have not been made part of the record on summary judgment by either party.

adjuster Michael T. Armstrong, also employed by Pilot Catastrophe Services.   (Plaintiff's

Opposition Ex. 7, Armstrong Depo, doc. 21-7 at 3).

Armstrong first spoke to plaintiff on June 1, the day the claim was transferred to him.  He

reported the conversation this way in the claim log:

> Voice contact with Mr. Michael Lord regarding the claim.  Mr. Lord filed a
> supplement for damages that were not included in the estimate by the original
> adjuster and for mold concerns.  The previous adjuster stated that he addressed all
> damages that were storm related and had a TA present for the inspection.  The
> only damage caused by this storm was roof damage.  All other damages are from
> various issues and preexisting conditions.   Mr. Lord is claiming that the
> windstorm caused foundation damage to the home and caused beams to shift, the
> house to un level [sic], tile to loosen and separate in 3 rooms, and numerous other
> problems not related to the storm.  I contacted the previous adjuster David Barnes
> and discussed the damages and mold concerns with him.  Mr. Barnes state that
> there was no mold odor or visible mold anywhere in the home at the time of his
> inspection and that insured cut open the carpet in front of Mr. Barnes.  The carpet
> did not appear wet at the time of the inspection.   I contacted Mr. Lord and
> requested photos of the mold in all areas that he is claiming and he agreed.

(*Id.* at 17).  Two days later, on June 3, Armstrong wrote the following entry:

> Mr. Michael Lord made a claim for damages to his home caused by windstorm.
> The home was inspected by OA [outside adjuster] David Barnes and Field
> Support on 5/2612011.  It was determined that the only storm related damage to
> the home was to the roof which the OA allowed the replacement of.  Insured has
> expressed mold concerns and stated that the carpet has mold.  I contacted insured
> and requested photos of the mold and also contacted OPA David Barnes to
> discuss the mold issue.  The OA stated that carpet was not wet at the time of the
> inspection and after reviewing the photos from insured I have determined that the
> mold issues that insured has are not related to the recent windstorm or water loss.
> Therefore I will be closing the claim without payment.  Insured has also requested
> a supplement for additional damages to the home that were not addressed by the
> OA.  I requested insured submit an estimate from his contractor and he agreed. I
> am closing the claim without additional payment until insured can submit a
> contractors [sic] estimate for the supplement.
>
> Denying mold coverage at this time.

(*Id.* at 18).  Likewise, in an entry recorded at 2:06 p.m., Armstrong noted that he called plaintiff to explain the denial of additional coverage and that "the claim is now closed." (*Id.*).  Armstrong followed up with a letter to plaintiff on June 3, saying that Allstate "must respectfully deny coverage for part of the damages you are claiming." (Plaintiff's Opposition, Ex. 6, doc. 21-6).

Plaintiff did not give up.  On June 8, he called again requesting an "update on the claim." (*Id.* at 19).  Plaintiff also contacted the Federal Emergency Management Agency ("FEMA"), requesting that someone be sent to his cabin to determine whether the damage was storm related. FEMA recommended Jay Jenkins, an architect trained by FEMA to make assessments of the structural safety of buildings impacted natural disasters.  (Plaintiff's Opposition, Ex. 9, Jenkins Depo., doc. 21-9 at 14-18).  Plaintiff contacted Jenkins, who came to inspect the cabin on June 24, 2011, and issued a report on June 27 (*Id.* at 25-28), making the following findings:

> On June 24, 2011, I reviewed the above referenced facility in respect to identifying damage caused due to storms on April 27, 2011.  As a registered architect, I was certified through FEMA in 2009 to make these assessments following completion of ATC-45 course.  My review of the condition of your structure revealed the following:
>
> Generally speaking, structure remains intact.  It appears as though a large tree fell near the house, landing on the electrical feed.  Due to the strong connection of the weather head mast to the house, the electrical was not pulled out of the house, as we typically see, but instead remained attached.  As the storm passed through, the weight of the tree on the electrical cables created a rippling effect, slowly pulling at all parts of the structure.
>
> Being a log styled home, with carefully fitted connections at all locations, the result was a rippling of the entire structure of the house, causing separation at a number of truss connections, some twisting and warping of structural members, sagging, buckling, and shifting of members in roof, walls  and floor systems.  This in turn caused some minor cracking of sheetrock (along joints in materials in all locations observed) and severe bucking of floor caused floor tile to crack or release its bond to the substrate.
>
> Additionally, cracks were noted in several locations where rock infill was placed between structural concrete piers along foundation.  As there is no apparent

footing in place for this material, it is quite possible this is the result of settlement
and is of no real consequence in regards to the safety of the structure.

(Defendant's Motion, Jenkins Report, Ex. 7, doc. 16-7).  In itemizing repairs that had to be made

to the cabin, Mr. Jenkins noted that "[s]everal of the bottom cords of trusses have begun to crack

and separate, again likely due to the excessive vibration caused by the tree bouncing on the

[electrical] cable."  (*Id.*).  Jenkins did not charge a fee for his assessment, but provided the

service free of charge through FEMA.

In the meantime, on June 14, 2011, Allstate employee Victoria Catrett again raised the

issue whether an engineering report on the plaintiff's cabin should be considered.  (Plaintiff's

Opposition, Ex. 2, doc. 21-2 at 19).  Her request was denied the next day.  Catrett noted in the

claim log, "Manger [sic] replied to email I sent requesting a file review for status on determining

if an engineer report will be requested.  Advised by management no engineer report will be

requested as Allstate has sufficient evidence to evaluate damages from inspections." (*Id.*).

On June 22, 2011, Sandra Lord again spoke with adjuster Armstrong, who told her that

the claim denial was final.  (*Id.* at 20).  On June 28, 2011, the real estate agent who had listed the

property for sale, Ronald Hayes, wrote a letter "To Whom It May Concern," in which he

recounted listing the cabin for sale and obtaining a contract for sale of the cabin for $59,000.  He

further reported that the buyer "then had her contractor do an inspection for her as one of the

contingencies of the contrac[t].  Other than some cosmetics, the inspection did not turn up an[y]

problems and the purchaser proceeded to finalize her financing.  This fell through as the bank

backed out telling her that it was a credit problem, not a property problem."  (Plaintiff's

Opposition Ex. 16, doc. 21-16).  The date on the sales contract was March 5, 2011.  (*Id.* at 7).

Nothing else of any significance occurred on the plaintiff's claim until September 19, 2011, when an attorney for the plaintiff forwarded a copy of the Jenkins report to Allstate and agent Watwood.  (Plaintiff's Opposition Ex. 8).  Although Allstate received a copy of the letter on September 21, 2011 (see Plaintiff's Opposition, Ex. 2, doc. 21-2 at 20), it was not until November 7, 2011, that Allstate reopened the claim and assigned it to Janice Flanagan in the Specialty Unit.  (Id. at 22).  On that same date, Flanagan requested an engineer inspect the cabin in response to the Jenkins report, and this was approved on November 9, 2011.  (Id. at 23).  A few days later, adjusting responsibility was transferred to Kareem Freeman.  (Id.).  The actual request for the assignment of an engineer occurred on December 16, 2011 (Id. at 25), and approved that same day.  (Id.).

On December 27, 2011, Peter Townsend of the Rimkus Consulting Group conducted an inspection of the plaintiffs' cabin for purposes of reporting to Allstate.  (Defendant's Motion Ex. 9, doc. 16-9 at 4).  Townsend is a civil engineer, not a structural engineer.  (Plaintiff's Opposition Ex. 9, Jenkins Depo, doc. 21-9 at 17).  While a structural engineer designs building frames, a civil engineer usually deals with storm drainage, grading, and other earthworks.  (Id. at 6).  A report by Townsend dated January 19, 2012, reached two conclusions regarding damage to the cabin:

> 1.  The displacement of the roof trusses, deflections in the walls, and damage to the tile floors of the Lord's residence were the result of substandard design and construction, unrelated to the damaged Weatherhead.
>
> 2.  The damage to the residence on the date of loss was limited to the electrical service Weatherhead, and, possibly, minor damage to the joints of the corrugated metal roof panels over the kitchen/utility area.  The weatherhead can be removed and replaced.  The roof over this area can be inspected and re-sealed, as necessary, at the joints.

(Defendant's Motion Ex. 9, doc. 16-9 at 4).   Rimkus was paid $5,112.50 by Allstate to produce the report.   (Plaintiff's Opposition Ex. 2, doc. 21-2 at 29).   The report was forwarded to plaintiff's previous counsel on February 2, 2012.  (Defendant's Motion Ex. 12, doc. 16-12).

Allstate's claim log reflects that a letter was mailed to plaintiff's previous counsel on March 20, 2012, indicating that unless additional information could be supplied, Allstate would close plaintiff's claim without payment for the additional structural damage he claimed. (Defendant's Motion Ex. 14, doc. 16-14).   On April 5, 2012, the claim was noted as closed. (Plaintiff's Opposition Ex. 2, doc. 21-2 at 30).


## IV.  <u>Analysis</u>

The only issue raised in the motion for summary judgment is whether plaintiff's claim for bad faith should be dismissed.   Allstate does not seek summary judgment on plaintiff's underlying contract claim for the insurance company's refusal to pay the full extent of damages he claims.  Defendant advances three arguments supporting summary judgment on the bad faith claim, but all three make the same essential point: Allstate had an "arguable, debatable reason" for denying coverage for the damage claimed by plaintiff.   Plaintiff responds that Allstate committed an "abnormal" bad faith in that it intentionally or recklessly failed to investigation his claim properly.

Courts in Alabama have long recognized two forms of the tort of bad faith failure to pay, referred to as "normal" and "abnormal" bad faith claims.

> The "unusual or extraordinary" case was then referred to as the "abnormal" bad-faith case, and the "directed-verdict-on-the-contract-claim" case was called the "normal" bad-faith case.  <u>See</u> <u>Mattiace</u>, *supra*, 679 So. 2d at 241 (Maddox, J., dissenting); <u>State Farm Fire & Cas. Co. v. Crumpton</u>, 708 So. 2d 136 (Ala. 1997) (Houston, J., dissenting); <u>Grissett</u>, *supra*, 732 So. 2d at 976.   Thus, a plaintiff must establish that his or her claim is either the normal case or the abnormal case

of bad faith.  To this date, the abnormal cases have been limited to those instances
in which the plaintiff produced substantial evidence showing that the insurer
(1) intentionally or recklessly failed to investigate the plaintiff's claim;
(2) intentionally or recklessly failed to properly subject the plaintiff's claim to a
cognitive evaluation or review; (3) created its own debatable reason for denying
the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a
lawful basis to deny the plaintiff's claim.

State Farm Fire & Casualty Co. v. Slade, 747 So. 2d 293, 306-07 (Ala. 1999).  In the "normal"

form of bad faith, the plaintiff can overcome summary judgment for the defendant insurer only

by showing that he is entitled to judgment as a matter of law on the underlying breach of contract

claim.  This is the so-called "directed-verdict-on-the-contract-claim" standard for a normal bad

faith claim.  Bad faith also can exist, however, where the insurer intentionally or recklessly fails

to properly investigate whether a claim is covered.  As the court in Slade explained:

> An insurance company's duty to investigate does not extend only to those events
> that are not covered.  As this Court stated in Lavoie, *supra*, 505 So. 2d at 1052–
> 53, an insurance company has a "responsibility to marshal all ... facts" necessary
> to make a determination as to coverage "*before* its refusal to pay." (Emphasis in
> original.)  This duty must include a duty to investigate a covered event that an
> insured claims has caused his loss.  Otherwise, the duty to properly investigate,
> imposed by the law regarding the tort of bad faith and recognized in Barnes,
> *supra*, would be meaningless.

Id. 747 So. 2d at 315-16 (Ala. 1999).  Negligent failure to investigate a claim is not enough;

there must evidence from which a jury can infer an intentional or reckless failure to properly

investigate.

The arguments of the parties in this case boil down to the interplay between two cases

decided by the Alabama Supreme Court.  Plaintiff relies primarily on Jones v. Alfa Mutual

Insurance Co., 1 So. 3d 23 (Ala. 2008), while distinguishing the more recent decision in State

Farm Fire & Casualty Co. v. Brechbill, ___ So. 3d ___, 2013 WL 5394444 (Ala. Sept. 27, 2013),

reh'g denied (Jan. 17, 2014), cited by defendant.   Reconciling these cases is not easy, but a careful examination of each reveals certain propositions of law relevant here.   Both cases are similar to the instant case in that they involve claims for extensive structure damage caused by a wind storm.

Jones was decided in 2008, arising out of damage to a house alleged to have occurred during Hurricane Opal in 1995.  Following the passing of the storm,

> [T]he Joneses contend[ed] that there were cracks in their interior drywall, the seams in the drywall ceiling of their house were visible, cracks appeared in the mortar of the exterior brick veneer of their house, and there were loose bricks in the veneer.  The Joneses also contend[ed] that a tree near their house was partially uprooted by the wind and that the tree fell onto and damaged the roof of their house.

Jones v. Alfa Mutual Ins. Co., 1 So. 3d 23, 25 (Ala. 2008).  The cracks in the drywall and brick veneer did not exist prior to the hurricane, according to the homeowners.  Only a few months before the hurricane (during the summer of 1995), their agent, Sanders, inspected the house as part of a "re-write" of their insurance.  He took photographs and later testified that he did not see damage to the house at that time.  The Joneses contacted their insurance carrier and filed a claim within a day or two after the hurricane.

> At an unspecified date, two Alfa adjusters came to the Joneses' residence to inspect the damage to the house.  According to Harold Jones, the two adjusters noted the damage to the roof of his house.  Harold Jones then showed the two adjusters damage to the drywall ceiling and the walls in his house.  The adjusters told Jones that that damage was outside the realm of their expertise and that someone else would inspect that damage.

Id., 1 So. 3d at 25.  An Alfa adjuster walked around the home, saw the roof damage and the cracks in the walls and brick veneer, but was unsure whether the drywall and brick veneer

damage was the result of the hurricane.  He consulted with his supervisor, and both determined that an engineer should inspect the house and offer an opinion about the cause of the damage.  Id.  An engineer was hired by Alfa to do so.

About a month after the storm, the Alfa-retained engineer went to the home.  The homeowner showed the engineer the cracks, and the engineer inspected the crawlspace under the house, but never went into the attic or on the roof.  The homeowner testified that, at the conclusion of the inspection, the engineer told him that he believed the hurricane winds had become trapped in the carport of the house and had lifted the roof, causing the house to shift.  Three weeks after the inspection, however, the engineer submitted a report to Alfa asserting the opinion that the cracking of the walls and brick veneer were due to settlement, not wind forces.  Id. at 26.  The next day, an Alfa representative telephone the homeowner with the conclusion that "the cracks in the drywall and exterior brick veneer were not covered by the insurance policy and that Alfa would pay benefits only for the damage to the roof."  Jones v. Alfa Mutual Ins. Co., 1 So. 3d 23, 26 (Ala. 2008).  A few weeks later, Alfa mailed a check to the homeowners' attorney covering only the visible damage to the roof.  Id.

The homeowners continued to complain to Alfa about the investigation of the damage and Alfa's failure to pay for anything but the roof damage.  Over two years later, in November 1997, the homeowners built a fire in the fireplace of the home, but a crack in the chimney allowed the fire to escape and cause additional damage.  A month later, representatives of Alfa came to the house with a second engineer to see "if there was anything we had missed."  Id. at 28.

After the Joneses filed suit, alleging breach of contract and bad faith refusal to pay, Alfa moved for summary judgment on the bad-faith claim, contending that the first engineer's report

expressing the opinion that the damage to the Joneses house was due to settlement and not wind forces precluded judgment as a matter of law on the homeowners' contract claim, thus entitling Alfa to summary judgment on plaintiffs' "normal" bad-faith claim.   The Alabama Supreme Court agreed, saying "it is apparent that [the engineer's] report creates a question of material fact that would preclude the Joneses from receiving a preverdict judgment as a matter of law on the underlying breach-of-contract claim."   Jones v. Alfa Mutual Ins. Co., 1 So. 3d 23, 34 (Ala. 2008).   The court went on hold, however, that the plaintiffs were entitled to proceed on their "abnormal" bad-faith claim.   The court explained:

> The following facts taken as a whole create a jury question.   After Hurricane Opal, Alfa *never* investigated any records it had of the condition of the Joneses' house before the hurricane.   The record reflects that Alfa *never* contacted a realtor who visited the Joneses' house three days before Hurricane Opal made landfall, even though, according to Harold Jones, Bradshaw had inquired about purchasing the Joneses' residence.   Alfa *never* inquired of the Joneses as to who would have seen their house before Hurricane Opal and *never* attempted to interview anyone who may have visited the Joneses' house before Hurricane Opal. Alfa *never* considered its own "rewrite" inspection of the Joneses' house, including photographs of the exterior of the house and never inquired of Sanders, its own employee, as to the condition of the Joneses' house when he conducted the "rewrite" inspection, even though Sanders testified that he did not recall seeing any cracks in the interior or exterior walls of the Joneses' house when he conducted the "rewrite" inspection three months before Hurricane Opal.

Jones v. Alfa Mutual Ins. Co., 1 So. 3d 23, 36-37 (Ala. 2008) (emphasis in original).   Thus, the court found that there was sufficient evidence for a jury to decide whether the insurer acted in bad faith by ignoring information contradicting its view that the damage was due to settlement. At the time Alfa denied the claim for additional damages (Alfa had paid for the roof damage), it had an engineer's report opining that the cracks in the walls and brick veneer were due to settlement, not wind forces.   Nevertheless, Alfa did not attempt to investigate whether this opinion was consistent with evidence related to the condition of the house before the storm,

including the statement of its own sales agent (Sanders), photographs taken by the agent, the knowledge of a realtor familiar with the house, or the knowledge of anyone else familiar with the house.

Five years later, the Alabama Supreme Court decided State Farm Fire and Casualty Company v. Brechbill, ___ So. 3d ___, 2013 WL 5394444 (Ala., Sept. 27, 2013), reh'g denied, ___ So. 3d ___ (Ala., Jan. 17, 2014),[5] in which it distinguished but did not overrule Jones.   Like Jones, this is a wind-damage case in which the homeowner contended that the insurer failed to conduct a proper investigation of his claim for damage to his home.   As with Jones, it is important to put the court's decision in the context of the facts and the procedural posture of the case.

Plaintiff Brechbill bought a thirty-year-old house in Lacey Spring, Alabama, in September 2007.  He obtained a home inspection as part of the transaction, but the inspection revealed no unusual problems for house of that age.  There was no cracking of walls and "no evidence of long-term settling of the house."  Id. at *1.  On January 29, 2008, a wind storm struck the house with winds of almost 60 miles per hour.  Brechbill alleged that the storm caused the house to shake so violently that a laptop computer on a desk "was actually walking across the desk."  Id.  The wind storm was so widespread it produced over 300 claims to defendant State Farm for property damage in the north Alabama area, and State Farm classified the event as a catastrophic event due to the number of claims.  Brechbill did not submit a claim immediately, but in the days following the storm, he noticed that his house was draftier, that there were cracks in the drywall, and that door jambs no longer fit properly around the doorways.  Two months after the wind storm, on March 31, 2008, Brechbill submitted a claim to State Farm for damage

---

[5]   For what it is worth, Brechbill has not been released for publication, even though a motion for rehearing has been denied.

done to his house by the wind event.  A State Farm adjuster inspected the house and found damage to roof shingles as well as drywall cracks and separated door jambs.  He concluded that although the roof shingles were covered by Brechbill's insurance, the interior damage to the drywall and doors was not.  Id. at *2.  The adjuster suggested that State Farm retain a structural engineer to determine the cause of the cracking and separated door jambs.

On April 24, 2008, an engineer hired by State Farm inspected Brechbill's house, and on May 5, 2008, he produced a report concluding that the cracks and misalignment of doors were due to "long-term movement and settlement" of the house coupled with "the design, framing, and construction methods used to construct" the house.  Based on this report, State Farm determined that the interior cracking and damage (as distinct from the exterior roof shingles) was not covered by Brechbill's insurance.  State Farm notified Brechbill that it would not pay for the interior damage.

Following the report by the State Farm engineer, Brechbill called the home inspector he had used at the time he bought the house and asked the inspector to compare the condition of the house after the wind storm to that at the time of the purchase.  The inspector, McCrispin, did so and reported in June 2008 that changes had occurred in the house, including sagging floors, a crack in the drywall near a window, and door trimmed popped loose.  In July 2008, Brechbill met with State Farm representatives and provide them with a copy of McCrispin's report.  They agreed to have their engineer look at the house again.  The engineer submitted his second report on July 29, 2008, again concluding that the interior damage to the house was not the result of the wind storm, and, again, State Farm sent Brechbill a letter denying coverage for the interior damage.

In August 2008, Brechbill hired another home inspector, Dr. William Payne,[6] to review the engineer's reports.  He concluded that the reports submitted by State Farm's engineer were "based on questionable logic and incomplete research."  In particular, he pointed out that the State Farm engineer had not addressed the condition of the house reflected in the home inspection carried out prior to the wind storm, but had simply assumed that the drywall cracking identified by Brechbill had existed before the wind storm.  Brechbill delivered a copy of Payne's report to State Farm in December 2008.  State Farm's engineer prepared a third report in response to Payne's report, apparently without conducting another inspection of the house.  In the supplemental report he changed his earlier assessment that the house had not been exposed to high winds, agreeing that winds between 55 and 65 miles per hour had struck the home.  He still concluded, however, that such winds were not "excessive."  Id.

Brechbill sued State Farm for breach of the insurance contract, "normal" bad faith for failure to pay, and "abnormal" bad faith for failure to conduct a reasonable investigation.  On motion for summary judgment by State Farm, the trial court granted judgment as to the "normal" bad faith claim, writing:

> "It appears to the Court that Brechbill has presented no serious opposition to State Farm's argument that his normal bad faith claim is not supported by substantial evidence.  He has created no genuine issue of material fact about whether or not State Farm had a reasonably legitimate or arguable reason for refusing to pay the claim on August 7, 2008. State Farm is entitled to a judgment as a matter of law on Brechbill's normal bad faith claim."

---

[6]  Although not stated explicitly in the opinion, it appears that Dr. Payne also was an engineer.  The opinion refers to his report as "Payne's engineering report."  State Farm Fire and Casualty Company v. Brechbill, ___ So. 3d ___, 2013 WL 5394444, *5 (Ala., Sept. 27, 2013), reh'g denied, ___ So. 3d ___ (Ala., Jan. 17, 2014).

State Farm Fire & Cas. Co. v. Brechbill, 2013 WL 5394444, *6 (Ala. Sept. 27, 2013), reh'g

denied (Ala. Jan. 17, 2014).  The trial court denied summary judgment on the "abnormal" bad

faith claim, relying on the precedent of Jones v. Alfa Mutual Ins. Co, 1 So. 3d 23 (Ala. 2008),

and reasoning that there was a genuine issue of fact as to whether State Farm had conducted a

good faith investigation of Brechbill's claim.  The case proceeded to trial on the breach of

contract claim and the "abnormal" bad faith claim, with the jury returning a verdict in favor of

plaintiff Brechbill on both theories.

On appeal, the Alabama Supreme Court first held that, although there are two methods

for proving the tort of bad faith, there is only one such tort.  The court explained that, whether

pleaded as a "normal" or an "abnormal" bad faith, there are four elements with a conditional fifth

element, as follows:

> "(a) an insurance contract between the parties and a breach thereof by the
> defendant;
>
> "(b) an intentional refusal to pay the insured's claim;
>
> "(c) the absence of any reasonably legitimate or arguable reason for that refusal
> (the absence of a debatable reason);
>
> "(d) the insurer's actual knowledge of the absence of any legitimate or arguable
> reason;
>
> "(e) if the intentional failure to determine the existence of a lawful basis is relied
> upon, the plaintiff must prove the insurer's intentional failure to determine
> whether there is a legitimate or arguable reason to refuse to pay the claim."

State Farm Fire & Cas. Co. v. Brechbill, 2013 WL 5394444, *8 (Ala. Sept. 27, 2013), reh'g

denied (Jan. 17, 2014), quoting National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179,

183 (Ala.1982).  "[F]or the tort of bad faith refusal to pay, '[r]equirements (a) through (d)

represent the "normal" case.  Requirement (e) represents the "abnormal" case.'"  Id. at *9,

quoting <u>Employees' Benefit Ass'n v. Grissett</u>, 732 So. 2d 968, 976 (Ala. 1998).   Because element (c) is a requirement of the tort of bad faith under either version of proof, the undisputed existence of a reasonably legitimate or arguable basis for refusal to pay precludes a finding of bad faith.

In <u>Brechbill</u> the court found it particularly important that the trial court had granted summary judgment to State Farm on the plaintiff's "normal" bad faith claim because the plaintiff created no genuine issue of fact as to whether State Farm had a reasonably legitimate or arguable basis for refusal to pay.   The supreme court quoted the trial court's order that:

> "Brechbill has presented no serious opposition to State Farm's argument that his normal bad faith claim is not supported by substantial evidence.  *He has created no genuine issue of material fact about whether or not State Farm had a reasonably legitimate or arguable reason for refusing to pay the claim on August 7, 2008.*"

<u>State Farm Fire & Cas. Co. v. Brechbill</u>, 2013 WL 5394444, *9 (Ala. Sept. 27, 2013), reh'g denied (Ala. Jan. 17, 2014) (emphasis in original). The court then reasoned that, "[b]ecause the trial court's ruling eliminated the third element of bad-faith refusal to pay, Brechbill's claim relying on the fifth element, i.e., that State Farm 'intentionally failed to adequately investigate' the claim, must fail."  <u>Id.</u> at *10.  At the conclusion of the opinion, the court again stressed that the trial court had found as a matter of law that State Farm had a legitimate, arguable reason for refusing to pay the claim at the time it denied the claim.  The court wrote, "A bad-faith-refusal-to-investigate claim cannot survive *where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied.*"  <u>Id.</u> at *11 (emphasis added).

Despite this clear holding, the supreme court went on to *distinguish*, but not overrule, Jones v. Alfa Mutual Insurance Co.  The court explained:

> The Jones case, relied upon by the trial court and Brechbill to permit the bad-faith-refusal-to-investigate claim to proceed, is distinguishable.  In Jones, we affirmed a summary judgment for Alfa Mutual Insurance Company on the Joneses' "normal" bad-faith-refusal-to-pay claim and found that Alfa's structural engineer's "report creates a question of material fact that would preclude the Joneses from receiving a preverdict judgment as a matter of law on the underlying breach-of-contract claim."  Jones, 1 So. 3d at 34.  We also concluded, in a portion of the decision joined by a plurality, that the following facts, taken as a whole, created a jury question on the bad-faith-refusal-to-investigate claim:
>
>> "After Hurricane Opal, Alfa *never* investigated any records it had of the condition of the Joneses' house before the hurricane. The record reflects that Alfa *never* contacted a realtor who visited the Joneses' house three days before Hurricane Opal made landfall, even though, according to Harold Jones, Bradshaw had inquired about purchasing the Joneses' residence.  Alfa *never* inquired of the Joneses as to who would have seen their house before Hurricane Opal and *never* attempted to interview anyone who may have visited the Joneses' house before Hurricane Opal.  Alfa *never* considered its own 'rewrite' inspection of the Joneses' house, including photographs of the exterior of the house and *never* inquired of Sanders, its own employee, as to the condition of the Joneses' house when he conducted the 'rewrite' inspection, even though Sanders testified that he did not recall seeing any cracks in the interior or exterior walls of the Joneses' house when he conducted the 'rewrite' inspection three months before Hurricane Opal."
>
> 1 So. 3d at 36–37.  Likewise, Brechbill asserts that State Farm never considered "before and after" evidence from its own insurance agent, from real-estate agents, from the prior owner, and did not speak to McCrispin or anyone else who may have seen the house before the windstorm.
>
> In Jones, evidence for the insurer's denial was gathered *after* the denial was made, whereas here a debatable reason for State Farm's denials existed at the time of the denials.  See, e.g., Pyun v. Paul Revere Life Ins. Co., 768 F.Supp.2d 1157, 1171–72 (N.D.Ala.2011) (holding that because "Met Life had a reasonably debatable reason for denying Plaintiff's claim at the time of its denial of Plaintiff's claim.... [, it] is entitled to summary judgment on Plaintiffs extraordinary bad-faith claim").

> State Farm may or may not have perfectly investigated (or reinvestigated) Brechbill's claim to his satisfaction, but perfection is not the standard here. "Alabama law is clear: ... regardless of the imperfections of [the insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim." Weaver, 574 So. 2d at 775 (quoting State Farm Fire & Cas. Co. v. Balmer, 891 F. 2d 874, 877 (11th Cir. 1990)). This fact, present in Weaver and in the instant case, was nonexistent in Jones.

State Farm Fire & Cas. Co. v. Brechbill, 2013 WL 5394444, *10-11 (Ala. Sept. 27, 2013), reh'g denied (Ala. Jan. 17, 2014) (emphasis in original).

The fact that the Alabama Supreme Court felt the need to distinguish Jones rather than overrule it leaves this court with the task of reconciling the two cases. The supreme court's attempted reconciliation is based on a distinction that is factually erroneous. Although the court said in Brechbill that the insurer in Jones, Alfa Mutual, gathered its evidence for denying the Joneses' claim *after* it had denied the claim, this is not true. As noted above, the supreme court's recitation of the facts in Jones makes clear that *at the time* it denied the Joneses' claim for structural damage, it had an engineer's report opining that the damage was due to "settlement, not wind forces." Jones v. Alfa Mutual Ins. Co., 1 So. 3d 23, 26 (Ala. 2008). Reading the facts in Jones closely, this court is baffled by the basis on which it was distinguished from the facts in Brechbill.[7]

---

[7]  The short concurring opinion of Justice Murdock in Brechbill adds some clarification to the majority's holding. While Justice Murdock agreed that "element (c)" ("the absence of any reasonably legitimate or arguable reason for that refusal") is a necessary element in both "normal" and "abnormal" bad faith cases, he rejected the idea that element (c) applies "in an absolute sense." Rather, he reasoned that the element refers to "an absence from the *insurer's decisional process* of a debatable reason." State Farm Fire & Cas. Co. v. Brechbill, 2013 WL 5394444, at *17 (Ala. Sept. 27, 2013), reh'g denied (Ala. Jan. 17, 2014) (emphasis added). In a footnote, Justice Murdock explained why the element of "an absence of any reasonably legitimate or arguable reason for the refusal" must be viewed as asking whether as part of the *decisional process* the insurer had a reason for refusal, rather than the absolute absence of a reason. He explained in part that treating element (c) in an absolute sense "would mean that,

Ultimately, the Alabama Supreme Court described the facts in <u>Brechbill</u> as simply lacking any signs of an intentional attempt by State Farm to avoid fairly and adequately investigating plaintiff's claim.  The court said:

> The facts before us do not rise to the level of bad faith, dishonesty, self-interest, or ill will inherent in bad-faith conduct.  Even if State Farm improperly omitted some aspects of a complete investigation, "more than bad judgment or negligence is required in a bad-faith action."  <u>Singleton v. State Farm Fire & Cas. Co.</u>, 928 So. 2d 280, 287 (Ala. 2005).  "Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." <u>Gulf Atlantic Life Ins. Co. v. Barnes</u>, 405 So. 2d 916, 924 (Ala. 1981).  A bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied.  Because State Farm repeatedly reviewed and reevaluated its own investigative facts as well as those provided by Brechbill, it is not liable for a tortious failure to investigate.

<u>State Farm Fire & Casualty. Co. v. Brechbill</u>, 2013 WL 5394444, *11 (Ala. Sept. 27, 2013), reh'g denied (Ala. Jan. 17, 2014).

Keeping in mind that Rule 56 requires the moving insurer to show the absence of any genuine issues of material fact and that the evidence and inferences must be viewed favorably to

---

even when there is in fact no true basis for refusing to pay an insured's claim… , an insurer might by dumb luck avoid any liability for its bad-faith refusal to pay the insured's claim without even investigating if, in fact, there was 'out there somewhere,' although unknown to the insurer, an 'arguable' reason for such a refusal."  <u>Id.</u> at fn. 2.  This understanding of element (c) makes the distinction between <u>Brechbill</u> and <u>Jones</u> more understandable.  To obtain summary judgment on a claim of bad faith failure to investigate, the insurer must show that there are no genuine issues of material fact as to whether it possessed "a *reasonably* legitimate or arguable basis" for denial of the claim during and at the time of its decisional process.  It is not enough for the insurer to dredge up such a reason *after* the denial, as such a *post hoc* reason would be unrelated to the fairness and good faith of its investigation.  If this were not the case, as Justice Murdock hints, insurers could willfully deny claims without any investigation and then undertake to identify a reason for the refusal only after the insured goes to the trouble and expense of suing the insurer.  This reading is consistent with the majority's holding that the insurer must have a reasonably legitimate or arguable basis for refusal "at the time" of the denial of the claim, i.e., a reason identified during the insurer's decisional process.

the non-moving plaintiff, the court finds in this case that there remain issues of fact concerning precisely *when* Allstate finally denied plaintiff's claim for structural damage and whether, at the time of the denial, Allstate had a *reasonably* legitimate or arguable basis for denying the claim.

    *A. Time of Denial*

Allstate first argues that it did not ultimately deny the plaintiff's claim for structural damage until April 5, 2012, at which time it was in possession of the Rimkus Consulting Group report indicating that the structural damage to the plaintiff's cabin was not due to wind, but to "substandard design and construction."   Plaintiff counters that Allstate denied his claim and closed the claim file at least twice before that date and before getting the engineer's report.

The court agrees with plaintiff that there are genuine issues of material fact on the question of when the plaintiff's claim was "denied" for purposes of accruing the bad faith claim. Because the date on which the claim is denied is critical to determining whether, at that time, the insurer has a reasonably legitimate or arguable basis for the denial, it is a fact question that must be resolved by the jury if there are genuine disputes of fact as to the date.   Those disputes of fact exist here, and a jury must decide whether the claim was denied on April 5, 2012, or on one of two earlier dates, May 26 or June 3, 2011, or at some other time.

Viewing the evidence favorably to the non-moving plaintiff, there is evidence from which a reasonable jury could find that Allstate finally denied plaintiff's claim for structural damage as early as May 26, 2011, or, perhaps, on or shortly after June 3, 2011.   By May 26, Allstate had already made the decision that it would not retain an engineer to inspect plaintiff's cabin, but instead would rely entirely in the opinion of two Pilot Catastrophe adjusters, Barnes and Henderson.   On that date, Barnes tendered to plaintiff the sum of $3,378.56, representing damage to the weatherhead mast and some roof damage, but none of the structural damage

claimed by plaintiff.  He wrote in the claim log at 12:56 p.m. that he was closing the claim and he testified later that that was his final decision on the claim.  A reasonable jury could find from this that Allstate denied plaintiff's claim for structural damage at that time, on May 26, 2011.

The continuing dialogue between plaintiff and Allstate after that date was at the insistence of the plaintiff.  The claim log maintained by Allstate makes clear that it was plaintiff who continued to call Allstate and proffer more evidence supporting his claim for damages.  There is no indication that, after March 26, 2011, Allstate initiated any additional discussions with plaintiff, consistent with its belief that it has closed the claim.  But even if Allstate can be credited with addressing what it called plaintiff's claim for "supplemental" damage, that too ended on June 3, 2011 (or shortly thereafter), when adjuster Armstrong denied the claim for both mold and structural damage and closed the file.  Although an employee of Pilot Catastrophe Services, Armstrong wrote a letter to plaintiff dated June 3, 2011, expressly denying plaintiff's claim.

Allstate argues that it continued to investigate plaintiff's claim for structural damages even after June 3.  Viewing the evidence favorably to the plaintiff, however, Allstate did little or nothing else to consider plaintiff's claim.  While plaintiff was obtaining the Jenkins report and a statement from a realtor about the pre-storm condition of the house, there is nothing in the evidence to indicate that Allstate was doing anything else on the claim.  On June 14, one Allstate employee raised the question whether an engineer should be hired to inspect the plaintiff's cabin, but that was shot down the next day.  On June 22, plaintiff's wife spoke to adjuster Armstrong, who told her that the denial was final.  Allstate did nothing else until September 2011 when a lawyer wrote a letter on behalf of the plaintiff and forwarded a copy of the Jenkins report.  Even then, it was two months later, in November, that Allstate finally agreed to hire an engineer to

inspect the home.  Thus, even if a jury did not find that the claim was denied on May 26, a reasonable jury could find that it was denied on June 3, or some other date shortly thereafter and long before Allstate engaged an engineer.  There are genuine issues of material fact concerning when Allstate actually and finally denied the claim for structural damage.

### B.  Existence of Reasonably Legitimate or Arguable Basis for Refusal

Because a reasonable jury could find that Allstate actually and finally denied plaintiff's claim sometime in 2011, the next question is whether Allstate has shown that there are no genuine issues of material fact concerning the existence of a reasonably legitimate or arguable basis for denying plaintiff's claim *at that time*.  Again, viewing the evidence favorably to the non-moving plaintiff, there remain genuine issues of fact on that question, as a reasonable jury could find that Allstate did not have a *reasonably* legitimate or arguable basis for denying plaintiff's claim for structural damages at the time the claim was denied.

At all times during 2011, and until the Rimkus report was produce in January 2012, the only evidence Allstate had that the structural damage claimed by plaintiff was not related to the April 27, 2011 tornado were the inspections by Pilot Catastrophe adjusters Barnes and Henderson.  Although both agreed that the interior cracking trusses and walls and the lifting of the floor were not caused by wind, they also acknowledged that an engineer should inspect the house and offer an opinion.  Both informed plaintiff that they would request an engineer inspection.  Plaintiff has testified that Barnes told him that he did not know how to adjust the loss claimed by plaintiff, and this is bolstered by Barnes's admission that plaintiff's cabin was his very first attempt to adjust a tornado loss.  Although Barnes had thirty years' experience in construction, he was only a part-time adjuster and had never been assigned a tornado loss before

this one.  Even though Barnes and Henderson[8] requested the assignment of an engineer, Chad Carroll denied that request after merely driving by the plaintiff's cabin.

In light of the information supplied by plaintiff, the inexperienced opinion of Barnes was not a *reasonably* legitimate or arguable basis for refusing the structural-damage claim.  There is strong evidence that high wind from a tornado was in the area of the cabin.  April 27, 2011, witnessed dozens of tornadoes across north and central Alabama.  There were so many claims from it, Allstate engaged Pilot Catastrophe Services to assist with adjusting them all.  Allstate knew that, in fact, a tree had been blown down in plaintiff's driveway, falling on the electrical service line connected to the house, and that the service line and weatherhead mast had *not* broken loose, doing damage to the house.  Other trees were blown down in a pasture behind the cabin.  Allstate knew that plaintiff told Barnes and Henderson that the visible damage inside the house had not existed prior to the tornado.  He informed Barnes that someone named Michael had inspected the cabin in 2010, when Allstate first insured it, and that the agent, Watwood, had insured it for a value of over $100,000.  Plaintiff supplied Allstate with interior and exterior photos of the house taken by a realtor who listed and sold the cabin in March 2011, just a month before the tornado.  The realtor later reported that a home inspection occurring just weeks before the tornado failed to reveal any significant defects in the home.  None of this information was investigated by Allstate.  This evidence appears to show that Allstate made no attempt to conduct a fair and good-faith investigation of cause of the damage.  There is no evidence that Allstate talked to its agent (Watwood) about the pre-storm condition of the cabin, even though Watwood communicated his concerns about the handling of the claim.  There is no evidence that Allstate

---

[8]  Although Henderson is identified as being in "Tech Support" or "Field Support," the record reveals nothing about his qualifications, if any, for assessing and determining the cause of the damage to the cabin.

attempted to identify the insurance inspector (Michael), or to talk to the realtor or to the purported purchaser of the cabin or to the home inspector engaged by the realtor or even to the renter who had been in the house after 2010. There is nothing to indicate that Allstate reviewed the "before" photos of the house sent by Sandra Lord. The fact that Allstate purposefully chose not to hire a structural engineer supports an inference that the insurer intentionally chose not to fairly investigate in good faith the cause of the damage.

In light of this information tending to show that the structural damage obvious after the storm had not been present before, a reasonable jury could find that Barnes's inexperienced opinion alone was not a reasonable basis for Allstate to deny plaintiff's claim that the structural damage happened during the storm. By Allstate's refusal to hire an engineer or to talk to any of the people with firsthand knowledge of the condition of the cabin, a reasonable jury could conclude that the insurer intentionally or recklessly turned a blind eye to the cause of the damage, preferring to rely on the opinion of a first-time adjuster who, according to plaintiff's testimony, admitted that he did not know how to adjust the claim. This exhibits the hallmarks of "a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest…." Gulf Atlantic Life Ins. Co. v. Barnes, 405 So. 2d 916, 924 (Ala. 1981). Given these disputes of fact, it is for a jury to determine whether the information possessed by Allstate constituted a "reasonably legitimate or arguable" basis for refusing to pay for the structural damage claimed by plaintiff at the time the claim was denied. Summary judgment will be denied.

DONE this 17th day of September, 2014.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE